**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KATHREIN-WERKE KG, A GERMAN CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 07 C 2921 |
| | ) | |
| RADIACION Y MICROONDAS S.A., d/b/a | ) | Judge Ronald A. Guzmán |
| RYMSA, a Spanish company, and | ) | |
| RYMSA Micro Communications, Inc., d/b/a | ) | |
| RYMSA WIRELESS, a New Hampshire | ) | |
| corporation, | ) | |
| | ) | |
| Defendants. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Kathrein-Werke KG ("Kathrein") has sued Radiación y Microondas S.A. and RYMSA

Micro Communications, Inc. (collectively "RYMSA") for alleged infringement of U.S. Patent

No. 6,850,130 ("the '130 Patent"), which describes a high-frequency phase shifter unit having a

pivotable tapping element. The case is before the Court for construction of seven claim terms.[1]

<u>**Facts**</u>

On July 27, 2000, Kathrein-Werke KG filed PCT patent application PCT/EP00/07236 for

a high-frequency phase shifter unit having a pivotable tapping element on behalf of the

inventors, Maximilian Gottl, Roland Gabriel and Mathias Markof. (*See* Pl.'s Claim Construction

Br., Ex. B, '130 Patent ("'130 Patent") at 1.) On February 1, 2005, the application issued as U.S.

Patent No. 6,850,130. (*See id.*)

---

[1]Although the parties dispute eight claim terms, because they agree that two of the disputed claim terms "pointer element" and "point element" have the same construction, the Court interprets seven claim terms.

Kathrein and RYMSA do not dispute the definitions of forty-two of the fifty claim terms. (*See* Defs.' Notice Undisputed Claim Terms, Ex. 1.) However, the parties ask the Court to construe the remaining eight disputed claim terms found in independent Claims 1, 22 and 24. (*See* '130 Patent, Claim 1, Col. 5, ll. 61-67 & Col. 6, ll. 1-19; *id.*, Claim 22, Col. 7, ll. 38-41 & Col. 8, ll. 1-6; *id.*, Claim 24, Col. 8, ll. 10-38; *see also id.*, Claim 3, Col. 6, ll. 24-27; *id.*, Claim 4, Col. 6, ll. 28-30; *id.*, Claim 15, Col. 7, ll. 10-13; *id.*, Claim 23, Col. 8, ll. 23-25.) The following terms are in dispute: (1) stripline sections; (2) tapping points; (3) pointer element; (4) extending; (5) transformers; (6) point element; (7) characteristic impedance; and (8) stripline elements.

Independent Claim 1 of the '130 Patent claims:

A radio-frequency phase shift assembly for coupling to a feed line, comprising:

at least first and second *stripline sections* which are arranged concentrically, said at least first and second *stripline sections* for coupling to at least two different pairs of antenna radiating elements driven with different phase angles (ϕ) at mutually offset *tapping points*,

a tapping element pivotable about a pivoting axis, the tapping element having a first tapping section for said first *stripline section* and having a second tapping section for said second *stripline section*, said first and second tapping sections being respectively pivotable over the associated first and second *stripline sections* and being coupled thereto,

at least first and second connection lines, the tapping element being connected to said feed line such that the feed line is electrically connected via the first and second connection lines to the first and second tapping sections associated with said first and second *stripline sections*,

wherein the tapping element comprises a *pointer element* which rotates about the pivoting axis, and

wherein the second connection line is disposed with respect to the second *stripline section* by *extending* the first connection line which leads to the first tapping section.

(*Id.*, Claim 1, Col. 5, ll. 61-67 & Col. 6, ll. 1-19 (emphasis added).)

Dependent Claim 3 claims: "The phase shift assembly as claimed in claim 1, wherein the first and second connection lines comprise *transformers* which share power in a predefined manner between the tapping sections of the at least first and second stripline sections." (*Id.*, Claim 3, Col. 6, ll. 24-27 (emphasis added).) Dependent Claim 4 claims: "The phase shift assembly as claimed in claim 1, wherein the tapping element comprises a radial *point element* originating from the pivoting axis." (*Id.*, Claim 4, Col. 6, ll. 28-30 (emphasis added). Dependent Claim 15 claims: "The phase shift assembly as claimed in claim 1, wherein the at least first and second stripline sections each have a defined *characteristic impedance*." (*Id.*, Claim 15, Col. 7, ll. 10-13 (emphasis added).)

Independent Claim 22 of the '130 Patent claims:

An RF phase shifter comprising:

plural arcuate *stripline elements* of different lengths; and

a pivotable radial tapping element capacitively coupled to tap each of said plural arcuate *stripline elements* simultaneously, said radial tapping element rotating about a pivoting axis, said radial tapping element dividing power unequally between said *stripline elements* in a predefined manner while simultaneously adjusting phase angle substantially equally in each of said plural arcuate *stripline elements*.

(*Id.*, Claim 22, Col. 7, ll. 38-41 & Col. 8, ll. 1-6 (emphasis added).) Dependent Claim 23 claims: "The phase shifter of claim 22 wherein the plural *stripline elements* each have first and second ends for connection to respective antenna radiating elements." (*Id.*, Claim 23, Col. 8, ll. 23-25 (emphasis added).)

Independent Claim 24 of the '130 Patent claims:

A radio-frequency phase shift assembly coupled to a feedline, comprising:

at least two *stripline sections* offset with respect to one another,

at least two different pairs of antenna radiating elements coupled to the at least
two *stripline sections* and driven with different phase angles ($\phi$) at
mutually offset *tapping points*,

a tapping element pivotable about a pivoting axis,

the tapping element having a tapping section for each *stripline section*, the
tapping sections being pivotable over the associated *stripline section* and
being connected thereto,

the tapping element connected to the feed line such that the feed line is
electrically connected via a number of connection lines to the tapping
sections which are associated with respective *stripline sections*,

wherein

the stripline sections are disposed in straight lines parallel to one another,

the tapping element comprises a *pointer element* which rotates about the pivoting
axis, and

the respective connection line is disposed with respect to a next, further outward
*stripline section* by *extending* an inward connection line which leads to a
respective further inward tapping section.

(*Id.*, Claim 24, Col. 8, ll. 10-38 (emphasis added).)

## Discussion

Claim construction is a question of law to be decided by a judge. *See Markman v.
Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996). To determine the meaning of disputed
claim language, the Court begins with an examination of the intrinsic evidence, which consists

of the patent claims, specification and prosecution history. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

When interpreting a patent claim term, courts "indulge a heavy presumption that a claim term carries its ordinary and customary meaning." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (quotation omitted). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention . . . ." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). To determine the ordinary and customary meaning, the Court must first look to the intrinsic evidence, which includes the claims, specification and prosecution history. *Id.* at 1316-17.

"An accused infringer may overcome this heavy presumption and narrow a claim term's ordinary meaning, but he cannot do so simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history." *CCS Fitness*, 288 F.3d at 1366 (quotation omitted). "[I]f an apparatus claim recites a general structure without limiting that structure to a specific subset of structures, we will generally construe the term to cover all known types of that structure that the patent disclosure supports." *Id.* (quotation omitted).

Extrinsic evidence may be used only if the Court cannot determine the meaning of the claims from the intrinsic evidence alone. *Vitronics Corp.*, 90 F.3d at 1583. Although extrinsic evidence, such as dictionaries and expert reports, may be helpful, it is unlikely to lead to a reliable interpretation "unless considered in the context of the intrinsic evidence." *Phillips*, 415 F.3d at 1319.

Again, the following terms are in dispute: (1) stripline sections; (2) tapping points; (3) pointer element and point element; (4) extending; (5) transformers; (6) characteristic impedance; and (7) stripline elements. The Court addresses each in turn.

## A.    Stripline Sections, Stripline Segments and Stripline Elements

The parties first dispute the meaning of the term "stripline." "When consulting the specification to clarify the meaning of claim terms, courts must take care not to import limitations into the claims from the specification." *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009). Thus, "the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Liebel-Flarsheim Co. v. Medrad*, 358 F.3d 898, 906 (Fed. Cir. 2004) (quotation omitted). This is especially true when the claim uses the word "comprising," which the Federal Circuit has consistently held to be an "open" transition phrase that means the claim's "scope may cover devices that employ additional, unrecited elements." *AFG Indus., Inc. v. Cardinal IG Co., Inc.*, 239 F.3d 1239, 1244-45 (Fed. Cir. 2001), *cert. denied*, 552 U.S. 1141 (2008).

RYMSA contends that a stripline is not just any shape, rather, it is a flat. RYMSA's proposed construction of stripline is "a flat conductive strip for transmitting electric signals." This, RYMSA argues, is clearly demonstrated in the plan view shown in Figure 2 of the '130 Patent and the cross-section view of the exemplary embodiment shown in Figure 3. (Defs.' Claim Construction Br. 7, 9.)

In *Liebel-Flarsheim*, the Federal Circuit held that "[a]lthough all the embodiments described in the common specification of the '669 and '261 patents include a pressure jacket, the written description does not contain a clear disavowal of embodiments lacking a pressure jacket." *Id.* at 908. Similarly, in the instant case, although Figure 3 of the '130 Patent shows a flat stripline section, that does not mean that every embodiment must be flat. (*See* '130 Patent, Fig. 3.) Moreover, Figure 3 was not intended to depict the structure of the stripline, but rather, to "explain the exemplary non-limiting capacitive coupling of the phase shift segment and of the center tap." (*Id.*, Col. 3, ll. 55-58.) The specification further states that Figure 3 shows "that the stripline segments are likewise located at the same distance as the center tap from the reflective plate." (*Id.*, Col. 4, ll. 60-65.) The figure's purpose is not to depict that the stripline sections are flat, and there is no disavowal of non-flat striplines. (*Id.*) Lastly, the plan view of the embodiment depicted in Figure 2 does not depict a flat stripline because it is not a cross-sectional view. (*See* '130 Patent, Fig. 2.) Neither the claims nor the specification indicate that the stripline must be flat.

Although RYMSA attempts to bolster its argument with extrinsic evidence, *i.e.*, the declaration of its expert and prior art patents (Defs.' Claim Construction Br. 10), in this case, the Court is not persuaded by such extrinsic evidence because the Court is able to determine the meaning of the claim term from the intrinsic evidence. Further, because defendant's extrinsic evidence that the stripline sections must be flat diverges from the intrinsic evidence, such extrinsic evidence is not a reliable interpretation when considered in the context of the intrinsic evidence. *See Phillips*, 415 F.3d at 1318 ("[A] court should discount any expert testimony that is clearly at odds with the claim construction mandated by the claims themselves, the written

description, and the prosecution history, in other words, with the written record of the patent."). Because the intrinsic evidence is generally controlling, the limitation of "flat" should not appear in the definition of stripline.

Addressing another aspect of the definition, RYMSA argues that the definition of a "stripline sections" is "devices, each comprising all or a portion of a flat conductive strip for transmitting electrical signals." RYMSA argues that because section and segment are used interchangeably, they should have the same ordinary meaning, *i.e.*, all or a portion of an item. (Defs.' Claim Construction Br. 15.) The Court agrees. (*See id.*, Ex. 2, June 4, 2008 Translation of German Patent Application No. 199 38 862.9-35 ("Ex. 2") at 43; *see also* '130 Patent, Col. 4, ll. 4-12.) However, the ordinary and customary meaning of the word "section" and "segment" is a portion of a larger whole, not "all or a portion." A reading of the claims and the specification clearly shows that the stripline sections or segments are part of the radio-frequency phase shift assembly. (*See* '130 Patent, Col. 5, ll. 61-67; *id.*, Col. 6, ll. 1-19; *id.*, Col. 4, ll. 4-12; *see* Defs.' Claim Construction Br., Ex. 2, at 43.) The Court finds that RYMSA's addition of the extraneous term "devices" does little or nothing to define the terms. The Court construes the term "stripline sections" and "stripline segments" to mean conductive strips that are a portion of the radio-frequency phase shift assembly that transmit electrical signals.

Lastly, RYMSA argues that the term "stripline elements" should be construed differently than "stripline section" and "stripline segment." "The doctrine of claim differentiation stems from the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope." *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1368 (Fed. Cir. 2005) (quotation omitted). "However, the

doctrine only creates a presumption that each claim in a patent has a different scope; it is not a hard and fast rule of construction." *Id.* The doctrine "can not broaden claims beyond their correct scope, determined in light of the specification and the prosecution history and any relevant extrinsic evidence. . . . [C]laims that are written in different words may ultimately cover substantially the same subject matter." *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1480 (Fed. Cir. 1998).

In *Pickholtz v. Rainbow Technologies, Inc.*, 284 F.3d 1365, 1373 (Fed. Cir. 2002), where the accused infringer argued that the patent's use of the terms "computer system" and "computer" showed that the term "computer system" should be given a broader construction, the Court stated that, although it typically would be "inclined to give meaning to word 'system,' rather than regard it as surplusage, the patent . . . provide[d] no indication that the two terms mean different things." Further, the *Pickholtz* court held that because the patent applicant did not attempt to distinguish "computer system" from "computer" when amending the claims to be allowed over prior art, the prosecution history did not necessitate a different result.

Likewise, in the instant case, the '130 Patent provides no indication that the "stripline elements," "stripline sections" and "stripline segments" mean different things. (*Compare* '130 Patent, Claim 1, Col. 5, ll. 61-67 & Col. 6, ll. 1-19, *with id.*, Claim 22, Col. 7, ll. 38-41 & Col. 8, ll. 1-6, *and id.*, Claim 23, Col. 8, ll. 23-25.) RYMSA notes that the term "stripline elements" only appears in Claim 22 and dependant Claim 23, which were added during the prosecution of the patent application. (Defs.' Ex. 3, March 30, 2004 Amended Patent Application, at 263-64.) However, the prosecution history of the '130 Patent does not indicate that Kathrein sought to distinguish "stripline elements" from the stripline sections or stripline segments in contrasting

the claims from prior art.  (*See* Defs.' Ex. 3, March 30, 2004 Amended Patent Application, at

263-64.)  RYMSA merely presumes that Kathrein's use of the broader nature of the term

"elements" in Claims 22 and 23 shows that it sought to obtain broader claim coverage.  (*Id.*)

However, RYMSA has not persuaded the Court that the term has a different meaning than

"stripline section" or "stripline segment" because the meaning of the term "element" is

necessarily dependant on the particular structural device that modifies or describes that particular

"element."  Having reviewed the intrinsic record, it is clear that Kathrein obstinately insists on

using three different terms to mean the same thing.   The Court agrees with Kathrein that

"stripline elements" should be construed the same as "stripline sections" and "stripline segments

because the intrinsic evidence does not draw any distinction between these terms.  (*See* '130

Patent, Claim 1, Col. 5, ll. 61-67 & Col. 6, ll. 1-19; *id.*, Claim 22, Col. 7, ll. 38-41 & Col. 8, ll. 1-

6; *id.*, Claim 23, Col. 8, ll. 23-25; *see also* Pl.'s Claim Construction Br. 15.)  Thus, the Court

rejects RYMSA's proffered construction of "stripline elements" as "one or an associated pair."

In sum, the Court construes the terms "stripline sections," "stripline segments" and "stripline

elements" to mean conductive strips that are a portion of the radio-frequency phase shift

assembly that transmit electrical signals.


**B.**     **Tapping Points**

The term "tapping points" appears in Claim 1 of the '130 patent, which claims, in

pertinent part:

A radio-frequency phase shift assembly coupled to a feedline, comprising: . . .

10

at least two different pairs of antenna radiating elements coupled to the at least two stripline sections and driven with different phase angles (φ) at mutually offset *tapping points* . . . .

('130 Patent, Claim 1, Col. 5, ll. 61-67 (emphasis added).)  RYMSA argues that the proper definition is "locations on the stripline sections or the center tap where electrical signals are transferred to or from the tapping element."  (Defs.' Claim Construction Br. at 17.)  Kathrein argues that the proper construction is "points where a signal is transferred from one circuit or system to another circuit or system."  (Pl.'s Claim Construction Br. at 9.)

RYMSA contends that tapping points are necessarily associated with a tapping element, either where the tapping element transfers signals to or from the stripline sections or to or from the center tap.  To determine the ordinary and customary meaning, again, the Court must first look to the intrinsic evidence, which includes the claims, specification and prosecution history. *See Phillips*, 415 F.3d at 1316-17.  The Court agrees with RYMSA that "tapping points" may be associated with a tapping element.  The specification of the '130 patent states "tapping element 25 forms a coupled tapping section or tapping point 27 in the respective area in which it overlaps an associated stripline segment 21."  (*See* '130 Patent, Col. 4, ll.15-18.)  The specification states that "[t]wo tapping points 27*a*, 27*b* are provided, in this example which are offset in the longitudinal direction of the tapping element 25."  (*Id.*, Col. 4, ll. 18-20.)  It is clear from the specification that the "tapping points" labeled as 27*a* and 27*b* in Figure 2 of the '130 Patent are associated with the tapping element.  (*Id.*)  The prosecution history also provides that the center tap 29 depicted in Figure 2 is also a "tapping point."  (Defs.' Claim Construction Br., Ex. 2, at 46.)

However, that "tapping points" *may be* associated with the tapping element does not mean that they *must always be* associated with the tapping element. The prosecution history makes it clear that "tapping points" mean more than merely the locations at which the tapping element overlaps the associated stripline sections or segments. Claim 1 of the '130 Patent claims, in pertinent part:

> A radio-frequency phase shift assembly for coupling to a feed line, comprising:
>
> at least first and second stripline sections which are arranged concentrically, said at least first and second stripline sections for coupling to at least two different pairs of antenna radiating elements driven with different phase angles (ϕ) at mutually offset *tapping points* . . . .

(*Id.*, Claim 1, Col. 1, ll. 61-67.) The prosecution history of Claim 1 (the amended German specification) shows that the inventors stated that the tapping points also include 39a and 39b in Figure 2, which are not associated with the tapping element in such a way that they are located where the tapping element overlaps the stripline sections or segments. (Pl.'s Claim Construction Br., Ex. C, June 7, 2001 Translation of '130 Patent, at 13.) The inventors stated: "on the at least two stripline sections (21*a*, 21*b*, 21*c*, 21*d*), at least two different pairs of antenna radiating elements (1*a*, 1*b*, 1*c*, 1*d*, 1*e*, 1*f*) can be driven with different phase angles (ϕ) at mutually offset tapping points (39*a*, 39*b*) . . . ." (*Id.*)

RYMSA argues that the German translation of '130 Patent is faulty and that "Abgriffstellen" is more properly translated to "tapping positions" rather than "tapping points." (Defs.' Ex., Wardell Decl. ¶¶ 9-10.) This argument is not persuasive because it does not explain why the inventors used the term "tapping" at all to describe 39a and 30b. RYMSA also does not attempt to explain the difference between the terms "points" and "positions." (Defs.' Claim

Construction Br. at 18.)  The only explanation is that the term "tapping" is not limited to RYMSA's crabbed reading because "tapping points" 39*a* and 39*b* in Figure 2 of the '130 Patent are not located where the tapping element overlaps the associated stripline sections or segments.

Lastly, the Court agrees with RYMSA that Kathrein's use of two additional undefined words, "circuit" and "system," as well as the word "points" in its proffered construction of the term "tapping points" creates unnecessary ambiguity.  Rather, the Court prefers the term "locations" over the term "points."  In addition, in construing the term "tapping points," the Court uses terms already defined by the parties or by this Court herein.   The Court interprets the term "tapping points" to mean "locations where electrical signals are transferred between, meaning to or from:  (1) the tapping element and the stripline sections, segments or elements, (2) the tapping element and the center tap, or (3) the antenna radiating elements and the stripline sections, segments or elements."


### C.        Pointer Element and Point Element

Next, the parties disagree about the proper construction of the terms "pointer element" and "point element," *see supra* n.1, as recited in Claims 1, 4 and 24 of the '130 Patent.  RYMSA defines the term as a "device that is shaped to point or indicate one or both direction(s) along a line."  (Defs.' Claim Construction Br. at 18.)  Kathrein defines the term "pointer element" as an "element that points or indicates."  (Pl.'s Claim Construction Br. at 10.)

First, RYMSA argues, and the Court agrees, that Kathrein's defining a term with the same term (using "element" to describe a "pointer element") is unhelpful.  *See K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1365 (Fed. Cir. 1999) (stating that the goal behind claim

construction is to explain the meaning of claim terms that may not be readily understood by the jury). Thus, the Court's construction of this claim term should not use the term itself.

Kathrein argues the terms "pointer element" and "point element" should be given their plain and ordinary meaning. (*See* '130 Patent, Claim 1, Col. 5, ll. 61-67 & Col. 6, ll. 1-19; *id.*, Claim 24, Col. 8, ll. 10-38.) Kathrein states that Claim 1 of the '130 Patent requires a pointer element that extends from the pivoting axis across two concentrically arranged stripline sections. (*See id.*, Fig. 2.) Thus, according to Kathrein, the pointer element extends in one direction only. (Pl.'s Claim Construction Br. 11.)

However, RYMSA argues that Kathrein's proposed construction of "pointer element" and "point element" ignores an exemplary embodiment described in the specification and depicted in Figure 5 of the '130 Patent. (*See* '130 Patent, Claim 24, Col. 8, ll. 10-38; id., Col. 5, ll. 32-44; *id.*, Fig. 5.) Courts "normally do not interpret claim terms in a way that excludes disclosed examples in the specification." *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007); *see MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir.2007) ("[A] claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct.") (internal citation omitted); *Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1578 (Fed. Cir. 1996) ("[I]t is unlikely that an inventor would define the invention in a way that excluded the preferred embodiment, or that persons of skill in this field would read the specification in such a way.").

Independent Claim 24, in pertinent part, claims a "radio-frequency phase shift assembly coupled to a feedline comprising . . . at least two stripline sections offset with respect to one another . . . wherein [they] . . . are disposed in straight lines parallel to one another . . . [and] the

14

tapping element comprises a pointer element which rotates about the pivoting axis." (*See* '130 Patent, Claim 24, Col. 8, ll. 10-33.) The specification states that Figure 5 "shows two straight striplines . . . which are . . . offset with respect to one another through 180° with respect to the pivoting axis." (*Id.*, Col. 5, ll. 32-35.) Thus, Figure 5 shows one stripline positioned outward from the pivoting axis and another stripline positioned parallel to the other stripline on the opposite side of the pivoting axis, such that the pointer element points in one direction in relation to one of the striplines and, at the same time, points in the opposite direction in relation to the other stripline. (*See id.*, Fig. 5.)

The Court agrees with RYMSA that the construction of "pointer element" and "point element" must be consistent with and support the language of Claims 1, 4 and 24, as shown in the embodiments of Figures 2, 4, 6, and 7 of the original specification. (*See* Defs.' Claim Construction Br., Ex. 2 at 44-49.) Because Kathrein's claim interpretation excludes one of its exemplary embodiments, the Court rejects it.

However, the Court also finds fault with RYMSA's proffered claim interpretation: "device that is shaped to point or indicate one or both direction(s) along a line." (Defs.' Claim Construction Br. at 18.) RYMSA's claim interpretation's inclusion of the phrase "device that is shaped" is unnecessary for a jury to understand that a pointer element must not be amorphously shaped such that it does not point. Further, RYMSA's inclusion of the phrase "along a line" is confusing because it is unknown whether "along a line" means along a line on the stripline or along a line on the pointer element or point element itself. Thus, the Court also rejects RYMSA's claim interpretation. Instead, the Court construes the terms "pointer element" and

"point element" to mean "an indicator that points either unidirectionally or bidirectionally in two opposite directions."

**D.      Extending**

The parties disagree about the proper construction of the term "extending."  RYMSA argues that "extending" means "lengthening in one or more direction(s)," while Kathrein argues that "extending," as recited in Claims 1 and 24, should be given its ordinary and customary meaning, *i.e.*, "lengthening."  (*See* '130 Patent, Claim 1, Col. 5, ll. 61-67 & Col. 6, ll. 1-19; *id.*, Claim 24, Col. 8, ll. 10-38.)

The Court agrees with Kathrein.  Adding the limitation of "in one or more direction(s)" to the definition of "extension" is improper because the intrinsic evidence does not require such a limitation.  Claim 1 claims "the second connection line is disposed with respect to the second stripline section by *extending* the first connection line which leads to the first tapping section," and Claim 24 claims "the respective connection line is disposed with respect to a next, further outward stripline section by *extending* an inward connection line which leads to a respective further inward tapping section."  (*Id.*)  In both claims, the term "extending" does not mean a lengthening of the connection line in one or more directions, but rather, it merely means a lengthening of the connection line to a tapping section.  It would only be necessary to add the limitation "in one or more direction(s)" if, like the pointer element or point element, the first and second connection line were treated as one.  However, unlike the pointer element or point element discussed above, the language of the claims shows that each connection line is its own.

The specification also supports this construction.  The specification states

> [t]he tapping element 25 includes a first connection line 31*a*. Connection line 31*a* extends from the coupling section 33 in the overlapping area of the center tap 29 to the tapping point 27*a* on the inner stripline segment 21*a*. The region which projects as an extension beyond this tapping point 28*a* forms the next connection section or connection line 31*b*.

(*Id.*, Col. 4, ll. 24-29.)

Because the specification also states that each connection line is treated separately with regard to the exemplary embodiment shown in Figure 2, it is unnecessary to add the limitation "in one or more direction(s)" because it necessarily follows that the connection lines as depicted in Figure 5, which "shows two straight striplines . . . which are . . . offset with respect to one another through 180° with respect to the pivoting axis" (*id.*, Col. 5, ll. 32-35), would also be treated as separate parts. (*See id.*, Col. 5, ll. 43-44 ("Description of similarly labeled elements in FIG. 2 will not be repeated here.") Thus, in Figure 5, connection line 31*a* extends from center tap 29 to the tapping point 27*a* and connection line 31*b* extends from center tap 29 to the tapping point 27*b*.

In sum, the claim language and the specification show that RYMSA's "in one or more direction(s)" interpretation is improper. Because it is possible to construe the term "extending" by examining the intrinsic evidence, contrary extrinsic evidence is not useful to the Court. Accordingly, the Court construes the term "extending" to mean "lengthening."

**E.**     **Transformers**

The parties dispute the meaning of the term "transformers" that appears in Claim 3 of the '130 Patent. Use of these transformers in the claimed high-frequency phase shifter unit is important because one of its advantages over prior art is its simplification of power sharing. (*See*

17

*id.*, Col. 2, ll. 45-48.)  Claim 3 claims "[t]he phase shift assembly as claimed in claim 1, wherein the first and second connection lines comprise transformers which share power in a predefined manner between the tapping sections of the at least first and second stripline sections."  (*Id.*, Claim 3, Col. 6, ll. 23-27.)  Further, Claim 2 claims that "the at least first and second stripline sections have different impedance values."  (*Id.*, Claim 2, Col. 6, ll. 20-23.)

However, both parties agree that the transformers themselves do not share power.  (See Kathrein's Claim Construction Br. 12 ("transformers . . . *permit* power sharing"); RYMSA's Claim Construction Br. 27 ("A [t]ransformer itself does not share power . . . .").  Thus, the Court's construction of this term within the context of Claim 3 shall reflect this concession.

The Court agrees with RYMSA that Kathrein's definition of transformers, when read in the context of Claim 3, is unhelpful because it merely repeats other language of the claim.  (*See* Pl.'s Claim Construction Br. 12; '130 Patent, Claim 1, Col. 5, ll. 61-67 & Col. 6, ll. 1-19; *id.*, Claim 3, Col. 6, ll. 24-27.)  "The phase shift assembly as claimed in claim 1, wherein the first and second connection lines comprise [the connection lines permit power sharing between the tapping sections] . . . which share power in a predefined manner between the tapping sections of the at least first and second stripline sections."  (Defs.' Claim Construction Br. 28 n.3.)

RYMSA argues that the claim and the specification show that transformers are "portions of the connection lines that are specifically designed for controlling the transmission of electrical signals." (RYMSA's Claim Construction Br. 27-28.)  First, with regard to RYMSA's interpretation that transformers are "portions of the connection lines," the Court does not find support for that construction in the intrinsic evidence.  It is clear that the transformers may be the entire connection lines because Claim 3 states that the first and second connection lines

themselves are transformers.  (*See* '130 Patent, Claim 3, Col. 6, ll. 23-27 ("wherein the first and

second connection lines comprise transformers"); RYMSA's Claim Construction Br., Ex. 2 at 46

("the transformers are the connections 31a and 31b").)  Because the transformers can be the

entire connection lines, and not merely a portion thereof, the Court will, in part, use the term

"devices" in this particular instance because the parties have not provided an alternative, more

accurate, term.

Second, with regard to RYMSA's construction that the transformers "are specifically

designed for controlling the transmission of electrical signals," RYMSA points to the

specification that states:

> Suitable selection of the characteristic impedances and suitable regions of the
> connections 31*a* and 31*b* between the corresponding tapping points 29 as well as
> tapping points 27*a* and 27*b*, respectively, now allows the power to be shared at
> the same time between the dipole radiating elements 1*a* and 1*d*, on the one hand,
> and the further pair of dipole radiating elements 1*b* and 1*c*.

('130 Patent, Col. 5, ll. 8-14.)  However, this language does not establish that transformers

"control" anything.  (*See* '130 Patent, Claim 3, Col. 6, ll. 23-27; RYMSA's Claim Construction

Br., Ex. 2 at 46, 51.)  Rather, in the context of the specification, the transformers (connection

lines 31a and 31b) transfer electrical signals and match impedance values between a source of

energy (center tap 29) and a load (tapping point 27*a* and corresponding dipole radiating elements

1*b* and 1*c* or tapping point 27*b* and corresponding dipole radiating elements 1*a* and 1*d*).  Because

the transformers enable power to be shared between the tapping sections of the at least first and

second stripline sections and because each stripline section has a different impedance value, the

transformers necessarily must match the impedance values between the source and the tapping

section of each stripline section.

Accordingly, the Court holds that a clearer, more accurate construction of "transformers" is "devices that transfer electrical signals and match impedance values." Thus, in the context of Claim 3, and given the parties' agreement that transformers do not themselves share power but enable the sharing of power, the definition reads: "The phase shift assembly as claimed in claim 1, wherein the first and second connection lines comprise . . . [*devices that transfer electrical signals and match impedance values*] which . . . [*permit the sharing of power*] in a predefined manner between the tapping sections of the at least first and second stripline sections."

## F.     Characteristic Impedance

Dependent Claim 15 claims: "The phase shift assembly as claimed in claim 1, wherein the at least first and second stripline sections each have a defined *characteristic impedance*." (*Id.*, Claim 15, Col. 7, ll. 10-13 (emphasis added).) While Kathrein argues that "characteristic impedance" should be given its ordinary and customary meaning of a "property of a radio-frequency transmission line that is primarily determined by the geometry of the transmission line" (Pl.'s Claim Construction Br. 14), RYMSA contends that the construction of the term "characteristic impedance" should be consistent with the parties' agreed construction of the term "impedance values," *i.e.*, "amounts of opposition to the flow of electric current" (Defs.' Claim Construction Br. 29-30; Notice Re: Undisputed Claim Terms, Ex. 1, Undisputed Claim Terms for '130 Patent, at 2).

The Court agrees with RYMSA that the proper definition of "characteristic impedance" must be consistent with the construction of the term "impedance values" as it is used in Claim 2 of the '130 Patent. Claim terms are normally used consistently throughout a patent, therefore the

usage of a term in one claim can often illuminate the meaning of the same term in other claims. *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001). Thus, "impedance" should have the same or similar meaning in every phrase in which it appears.

In support of its construction, Kathrein relies a dictionary's definition of "characteristic impedance" as "a property of antenna transmission lines that is determined primarily by the diameter of the conductors and the spacing between them." (Pl.'s Claim Construction Br. 14, Ex. D, Modern Dictionary of Electronics 111 (7th ed. 1999).) In response, RYMSA argues that because transmission line geometry affects various physical and electromagnetic properties, a construction hinging on geometry may encompass a myriad of other unspecified properties. (Defs.' Claim Construction Br. 29-30.)

The Court finds Kathrein's definition problematic. Kathrein's dictionary definition of characteristic impedance includes reference to the spacing between the conductors and their diameter. (*Id.*) However, Kathrein has not explained how this is necessarily equivalent to the "geometry" of the transmission line, the phrase it uses in its definition of "characteristic impedance."

RYMSA's proffered construction of characteristic impedance is "the existing amount of opposition to the flow of electric current of a stripline." (Defs.' Claim Construction Br. at 30.) The Court finds RYMSA's use of the phrase "of a stripline" redundant when read in the context of the claim. Because the claim language states that each stripline has a defined characteristic impedance, it is unnecessary to add the descriptor "of a stripline." Further, the term "existing" by itself does not explain to a jury how "impedance value" differs from "characteristic impedance" because the latter term would be defined as "the existing impedance value."

The definition of characteristic impedance is closely related to, but not the same, as the definition of "impedance value." The parties agree that the definition of impedance values is "amounts of opposition to the flow of electric current." An impedance value is a calculable number that represents characteristic impedance. Characteristic impedance, on the other hand, is the amount of opposition to the flow of current that exists at any point as the electrical signal moves down a transmission line. (*Id.* (defining characteristic impedance as "[t]he ratio of voltage to current at every point along a transmission line on which there are no standing waves").) Generally speaking, it could differ at different points. However, in the context of Claim 15, the Court's construction of "characteristic impedance" reads: "The phase shift assembly as claimed in claim 1, wherein the at least first and second stripline sections each have a defined [amount of opposition to the flow of current that exists at any point as the electrical signal moves down a transmission line]."

## Conclusion

For the foregoing reasons, the eight disputed claim terms of the '130 Patent are construed as set forth in this Memorandum Opinion and Order.

**SO ORDERED.**                                     **ENTERED:**


**May 17, 2010**                    _____

                                    **HON. RONALD A. GUZMAN**
                                    **United States District Judge**