**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **KATHREIN-WERKE KG, a German corporation,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **07 C 2921** |
| | ) | |
| **RADIACION Y MICROONDAS S.A., d/b/a** | ) | **Judge Ronald A. Guzmán** |
| **RYMSA, a Spanish company, and** | ) | |
| **RYMSA Micro Communications, Inc., d/b/a** | ) | |
| **RYMSA WIRELESS, a New Hampshire** | ) | |
| **corporation,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Kathrein-Werke KG ("Kathrein") has sued Radiación y Microondas S.A. and RYMSA

Micro Communications, Inc. (collectively "RYMSA") for alleged infringement of U.S. Patent

No. 6,850,130 ("the '130 Patent"). Before the Court are the parties' cross motions for partial

summary judgment. For the following reasons, the Court denies plaintiff's motion and strikes as

moot in part, grants in part and denies in part defendants' motion.

## Facts

Kathrein is in the wireless communications industry and makes and sells cellular

antennas and systems, among other products. (Pl.'s LR 56.1(a)(3) Stmt. ¶ 2.) RYMSA also

makes and sells antennas and antenna systems. (Defs.' LR 56.1(a)(3) Stmt. ¶ 6.)

The '130 Patent discloses an improved radio-frequency phase shift assembly including at

least one further stripline section arranged concentrically with respect to a first stripline section for use in base station antennas for cellular telephone systems. (Defs.' Mem. Supp. Mot. Partial Summ. J., Ex. 5, '130 Patent col. 5, line 61-col. 6, line 19 ("'130 Patent").) It is an improvement over the prior art because, among other reasons, it is a simpler design and allows for higher integration density. '130 Patent col. 2, lines 40-51.

Maximilian Gottl, Roland Gabriel and Mathias Markof are the named inventors of the '130 Patent (collectively hereinafter "the Inventors"). (Pl.'s LR 56.1(a)(3) Stmt. ¶ 22.) The Inventors filed their initial patent application in Germany on August 17, 1999. (*Id.* ¶ 23.) Less than a year later, on July 27, 2000, the Inventors filed an international patent application under the Patent Cooperation Treaty ("PCT"), which was processed and examined in the European Patent Office ("EPO"). (*Id.* ¶¶ 24, 25.) [1]

On February 22, 2001, the Inventors began an international examination of their PCT application at the EPO. (*Id.* ¶ 25.) On July 25, 2001, the Inventors filed an amendment that included, *inter alia*, replacement sheets for the specification in response to Examiner A. Kaleve's first written opinion. (*Id.* ¶¶ 26, 27.) On August 13, 2001, Examiner Kaleve, in his International Preliminary Examination Report ("IPER"), stated that the replacement sheets inappropriately introduced substantive matter that went beyond the disclosure in the international application as filed, and that those parts were not taken into consideration. (Defs.' Claim

---

[1]According to the guidelines of the PCT, an international patent application is followed by a national examination in countries where the inventor wishes to pursue a patent. Patent Cooperation Treaty Articles 3, 25; *see Voda v. Cordis Corp.*, 476 F.3d 887, 890, 899 (Fed. Cir. 2007) ("The foreign patents issued from a common Patent Cooperation Treaty ('PCT') application. . . . [T]he text of the PCT maintains the independence of each country's patents."). After the international examination in the EPO, the Inventors pursued a national examination in both the U.S. Patent and Trademark Office ("USPTO"). (Pl.'s LR 56.1(a)(3) Stmt. ¶¶ 25, 30.)

Construction Br., Ex. 3 - Part 1, IPER, at 89.)

On February 19, 2002, the Inventors began a national examination of their PCT application in the USPTO. (Pl.'s LR 56.1(a)(3) Stmt. ¶ 30.) The May 10, 2002 Notice of Acceptance of Application indicated that the USPTO had received, *inter alia*, a copy of the PCT application and a copy of the IPER. (*Id.* ¶ 32.) On May 15, 2002, the Inventors submitted to the USPTO an English language translation of the IPER. (*Id.* ¶ 33.)

On October 30, 2003, USPTO Primary Examiner Benny Lee issued an Office Action instructing the Inventors to submit a substitute specification because text appeared to be missing from the specification as filed. (*Id.* ¶ 36.) On March 30, 2004, the Inventors filed a response to Examiner Lee's Office Action, including a substitute specification. (*Id.* ¶ 39.) The Inventors represented to the USPTO that the substitute specification did not contain new matter. (*Id.* ¶ 40.) After additional correspondence with the USPTO, the application eventually issued as the '130 Patent on February 1, 2005. (Pl.'s LR 56.1(a)(3) Stmt. ¶ 43.)

Kathrein alleges that RYMSA infringes the '130 Patent. (*Id.* ¶ 11.) RYMSA has asserted the following defenses and counterclaims: (I) non-infringement of the '130 Patent; (ii) invalidity of the '130 Patent based on §§ 101, 102, 103 and 112; (iii) attorneys' fees pursuant to 25 U.S.C. § 285; and (iv) unenforceability of the '130 Patent due to inequitable conduct during the prosecution of the patent. (Defs.' 1st Am. Answer & 1st Am. Countercls.)

## Discussion

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, (1986). Initially, the moving party bears the burden of identifying those parts of the record that establish the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party must go beyond the pleadings and present specific facts to establish that there is a genuine issue of material fact for trial. *See* Fed. R. Civ. P. 56(e)(2); *Celotex*, 477 U.S. at 324.

## I.    RYMSA's Motion for Partial Summary Judgment

RYMSA has moved for partial summary judgment on four issues: (1) Kathrein is not entitled to recover any damages more than a reasonable royalty; (2) damages may only be calculated beginning from May 24, 2007, the date of the complaint; (3) Kathrein's antennas, as depicted in certain engineering drawings, are "prior art" to the '130 patent under 35 U.S.C. § 102(b); and (4) the August 19, 2004 amendments to Claim 1 were substantive and broadened its scope. The parties have stipulated as to the first two issues. (*See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 4, 13.) Therefore, the Court strikes as moot that portion of defendants' summary judgment motion that addresses damages and solely addresses the latter two arguments.

RYMSA moves for summary judgment on the issue of whether certain engineer drawings

are prior art.  RYMSA attempts to establish that such drawings are prior art in order to establish

that the '130 Patent is invalid.  (Defs.' Mem. Supp. Mot. Partial Summ. J. 12.)  RYMSA claims

that Kathrein's engineering drawings are prior art because they have been admitted to be prior

art and, alternatively, because antennas embodying the engineering drawings were sold more

than a year prior to the filing date of the '130 Patent.  (Defs.' Mem. Supp. Mot. Partial Summ. J.

11-12, 18.); *see* 35 U.S.C. § 102(b).

RYMSA also moves for summary judgment as to whether the amendments made to

Claim 1 on August 19, 2004 were improper.  (Defs.' Mem. Supp. Mot. Partial Summ. J. 28.)

RYMSA claims that the amendments were substantive because they broadened the scope of the

claim by allowing more devices to be covered under it after the amendment than before.  (Defs.'

Mem. Supp. Mot. Partial Summ. J. 28.)


### A.  Engineering Drawings as Prior Art

RYMSA first contends that engineering drawings discovered during the course of this

litigation are prior art because Kathrein tacitly admitted that they are, either during the

prosecution of the '130 Patent or during the instant litigation.  *See* 35 U.S.C. § 102.  Admissions

made in the specification or made during prosecution identifying the work of another is prior art

is an admission which can be relied upon for both anticipation and obviousness determinations.

Manual of Patent Examining Procedure ("MPEP") § 2129; *Riverwood Int'l Corp. v. R.A. Jones

& Co.*, 324 F.3d 1346, 1354 (Fed. Cir. 2003); *Constant v. Advanced Micro-Devices Inc.*, 848

F.2d 1560, 1570 (Fed. Cir. 1988).  Further, it is not "unfair or contrary to the policy of the patent

system that . . . [the invention is] judged on obviousness against . . . [the inventor's] actual contribution to the art." *In re Fout*, 675 F.2d 297, 301 (Fed. Cir. 1982).

The purported admissions are:  (1) the similarity between FIG. 1 of the '130 Patent, which is labeled "prior art," and the engineering drawings; (2) one of the Inventors' testimony that the engineering drawings are "prior art"; (3) Kathrein's providing the engineering drawings upon RYMSA's request; and (4) Kathrein's positive response to RYMSA's request to admit that the engineering drawings are prior art.  (Defs.' Mem. Supp. Mot. Partial Summ. J. 13-18.)

First, RYMSA provides neither factual nor legal support for its contention that since FIG. 1 of the '130 Patent, which is admitted by Kathrein to be prior art, is an abstract representation of the engineering drawings, the engineering drawings are also prior art.  (Defs.' Mem. Supp. Mot. Partial Summ. J. 14.)  RYMSA offers no evidence to show that FIG. 1 of the '130 Patent is an abstract representation of the engineering drawings or cases in which an abstract representation of prior art independently constitutes prior art.  Thus, RYMSA simply has not established that no triable issue exists regarding whether Kathrein admitted that the engineering drawings are prior art based on FIG. 1.

Next, RYMSA argues that the testimony of Maximilian Gottl, one of the named inventors of the '130 Patent, that the engineering drawings were "prior art" establishes that they are prior art.  (Defs.' Mem. Supp. Mot. Partial Summ. J. 15.)  During Gottl's deposition, RYMSA's counsel presented him with two of the engineering drawings that depicted phase shifters with single striplines and asked him whether the phase shifters were developed in accordance with the '130 Patent.  (Defs.' Mem. Supp. Mot. Partial Summ. J., Ex. 12, Eng'g

Drawings, K0003257 & K0003258; Defs.' Mem. Supp. Mot. Partial Summ. J., Ex. 17, Gottl

Dep. 20:21-21:2.) Gottl stated that those phase shifters were not developed in accordance with

the '130 Patent but then stated that they were "prior art." (Defs.' Mem. Supp. Mot. Partial

Summ. J., Ex. 17 Gottl Dep. 21:3.) However, Gottl, who is not a demonstrated expert in U.S.

patent law, went on to state that, "[p]rior art in this case means that it has one stripline only."

(*Id.* 21:6-7; *see* Defs.' LR 56.1(a)(3) Stmt. ¶ 18.) Given the inconsistency and vagueness of his

testimony, it is not clear whether Gottl knew of the particular engineering drawings at the time of

the invention and whether he was admitting that the phase shifters with single striplines were

prior art. Again, drawing reasonable inferences in favor of non-movant Kathrein, RYMSA

cannot succeed in a motion of summary judgment under this argument.

  Next, RYMSA argues that Kathrein's providing the engineering drawings upon

RYMSA's request during the instant litigation is an implicit admission that they constitute prior

art. (Defs.' Mem. Supp. Mot. Partial Summ. J. 16.) On February 6, 2009, counsel for RYMSA

requested from Kathrein "[e]ngineering drawing(s) sufficient to show a representative Kathrein

antenna containing two phase shifters, each with only one arcuate stripline, of the general design

depicted in K003258." (*See* Defs.' LR 56.1(a)(3) Stmt. ¶ 19; Defs.' Mem. Supp. Mot. Partial

Summ. J., Ex. 18, Letter of 2/6/09 from B. Babcock to S. Burow.) RYMSA did not request or

mention "prior art" anywhere in the letter. (*See id.*) In response, Kathrein sent engineering

drawing K00015793, but it made no admission that it was prior art. (Defs.' Mem. Supp. Mot.

Partial Summ. J., Ex. 19, E-mail of 3/6/09 from S. Burow to B. Babcock.) Kathrein's production

of an engineering drawing does not necessarily equate to an admission of prior art, particularly

when there was no use of the language "prior art" or anything implying "prior art" in the

correspondence between Kathrein and RYMSA. Accordingly, RYMSA cannot succeed under this argument.

RYMSA also argues that Kathrein's response to RYMSA's requests for admission establishes the engineering drawings are prior art. (Defs.' Mem. Supp. Mot. Partial Summ. J. 16.) In its response, Kathrein admitted that "prior to August 17, 1998, Kathrein manufactured devices having phase shifters as depicted in Figure 1 of the '130 Patent" and that "Kathrein offered for sale in the United States before August 17, 1998 an antenna model (or panel model) containing a variable phase shifter." (Defs.' Mem. Supp. Mot. Partial Summ. J., Ex. 9, Pl.'s Objections & Resps. Defs.' 1st Set Reqs. Admission 8-9, 26.) However, RYMSA does not establish that the phase shifters that Kathrein was referring to in its admissions were those that practiced the engineering drawings. Drawing all reasonable inferences in favor of non-movant Kathrein, the evidence provided by RYMSA does not establish that Kathrein admitted that the engineering drawings were prior art. Therefore, RYMSA's motion for partial summary judgment cannot succeed under this argument.

RYMSA's alternative argument, *i.e.*, that Kathrein sold antennas that embodied the prior art engineering drawings before the on-sale bar date of August 17, 1998, assumes that the engineering drawings are, in fact, prior art due to Kathrein's purported admissions.[2] Because the

_____

[2]The Court notes that RYMSA does not argue that the antennas Kathrein sold embody the '130 Patent in its entirety. Rather, RYMSA argues that the antennas, in combination with other prior art, make the claims of the '130 Patent obvious. However, the on-sale bar analysis remains the same because RYMSA may arguably rely on the sales of the antennas in combination with other prior art to demonstrate that the invention is "obvious" under 35 U.S.C. § 103. MPEP § 2141.01; *Ex parte Andresen*, 212 U.S.P.Q. 100, 102 (Pat. & Tr. Office Bd. App. 1981) ("[I]t appears to us that the commentator [of 35 U.S.C.] and the [congressional] committee viewed

record does not establish that Kathrein admitted the engineering drawings are prior art, the Court solely addresses whether a sale of antennas that purportedly embodied the engineering drawings occurred prior to the on-sale bar date.

A person is not entitled to a patent if the invention was on sale more than one year prior to the date of the application for the patent. 35 U.S.C. § 102(b). Sale of an invention makes it "prior art" under § 102(b), and prior art can be used alone or in conjunction with other prior art in an obviousness analysis under § 103. *Dippin' Dots v. Mosey*, 476 F.3d 1337, 1344 (Fed. Cir. 2007) ("Prior art under the § 102(b) on-sale bar is also prior art for the purposes of obviousness under § 103.")

To prove that such sales occurred, RYMSA has provided Scala's purchase orders of Kathrein's antennas as well as Kathrein's delivery notes and invoices evidencing the fact of deliver and the prices of the antennas. (Defs.' Mem. Supp. Mot. Partial Summ. J., Exs. 22 & 23, Evidence of Antenna Sales.) It is undisputed that Kathrein sold to Scala Eurocell Panel Antenna Models 738-018, 737-906, 736-077 before the on-sale bar date of August 17, 1998. (*See* Defs.' LR 56.1(a)(3) ¶¶ 25-27.)[3] Scala ordered and received from Kathrein six of Eurocell Panel Antenna Model 738-018 in August-September 1997, four in December 1997, two in February 1998, one in April 1998 and one in May 1998. (*Id.* ¶ 37; Defs.' Ex. 23, Purchase Orders and Invoices, at K0019976-78, K0018054, K0019979-89 (Scala's purchase order number 25260 at

_____

section 103 as including all of the various bars to a patent as set forth in section 102.").

[3] These statements of fact are admitted in part and deemed admitted in part due to Kathrein's failure to comply with LR 56.1 because it did not provide any citation to the record to support its partial denial of these fact statements.

KOO19985 stating "SCHEDULE SHIPMENT FOR 21.05.98 OR SOONER ANYHTHING [sic] YOU CAN DO TO EXPEDITE ORDER IS APPRECIATED - ORDER WAS NOT PLACED WHEN IT SHOULD HAVE BEEN AND WE MISSED THE CUSTOMER'S EXPECTED SHIPDATE [sic]").) Scala ordered and received from Kathrein one of Eurocell Panel Antenna Model 737-906 in May 1997 and twenty in September 1997. (*See* Defs.' LR 56.1(a)(3) ¶ 37; Defs.' Ex. 23, Purchase Orders and Invoices, at K0019970-75, K0019963, K0018053.) Scala ordered and received from Kathrein one of Eurocell Panel Antenna Model 736-077 in May 1997. (*See* Defs.' LR 56.1(a)(3) ¶ 37; Defs.' Ex. 23, Purchase Orders and Invoices, at K0019967-68, K0019962, K0018051.)[4]

Kathrein argues that these documents reflect deliveries but not sales of antennas to Scala. However, Manfred Muenzel, President of Scala, testified that its usual business practice was to purchase antennas from Kathrein and then sell them to customers and to pay for an antenna within thirty days of receipt unless it is a free sample for the startup of a new product. (Defs.' Ex. 6, Muenzel Dep. at 67, lines 1-9; *id.* at 73:12-18.) Contrary to Kathrein's assertions otherwise, Muenzel's testimony is not based on speculation but on his own personal knowledge. Based on the summary judgment record before the Court, no reasonable jury could find in Kathrein's favor, *i.e.*, that there had been no sale from Kathrein to Scala of Eurocell Panel Antenna Models 738-018, 737-906, 736-077 before the critical date of August 17, 1998.

Alternatively, Kathrein argues that the sales to Scala do not trigger the § 102(b) on-sale

---

[4]Although it is undisputed that Scala's sales data for 1996-98 show the above-mentioned Eurocell models as well as Americell Antenna Model Nos. AP13-850/065/ADT, AP11-850/090/ADT, RYMSA provides no explanation or foundation for the data, let alone that the models embodied the invention. (*See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 41.)

bar because Kathrein and Scala had the same owner.  (Pl.'s Opp'n Defs.' Mot. Partial Summ. J.

5-9.)  "A section 102(b) sale or offer must involve separate entities."  *Ferag AG v. Quipp Inc.*,

45 F.3d 1562, 1567 (Fed. Cir. 1995).  When the parties to an alleged sale are related, it is more

difficult to determine whether the sale involves separate entities, and the appropriate question is

whether the seller so controls the purchaser such that the invention remains out of the public's

hands.  *See id.*

In *Ferag*, the plaintiff and company to which it made the alleged sale had a common

owner.  *Id.* at 1565.  However, because the seller did not have "complete management authority

over the operations" or otherwise run the company to which it made the sale, the *Ferag* court

concluded that the two companies were separate and the transaction between them was subject to

the on-sale bar.  *Id.* at 1567.

Like the parties to the invalidating sale in *Ferag*, Kathrein is a foreign company that sells

its goods in the U.S. to Scala, a related company.  However, Muenzel, the president of Scala, has

testified that Anton Kathrein exercised almost no control over Scala and was not involved with

its day-to-day operations, assertions that Kathrein has admitted.  (Defs.' Mem. Supp. Mot.

Partial Summ. J., Ex. 6, Muenzel Dep. at 183, 193; *see* Defs.' LR 56.1(a)(3) Stmt. ¶ 11.)

Muenzel confirmed this in his deposition, stating that his running of Scala is autonomous from

Kathrein.  (Defs.' Mem. Supp. Mot. Partial Summ. J., Ex. 6, Muenzel Dep. at 193, lines 21-22.)

Kathrein argues that the case is distinguishable because the plaintiff in *Ferag* did not own

a majority share of the related company, and it is undisputed that Kathrein owned a majority of

Scala at the time of the allegedly invalidating sale.  (Defs.' Reply Supp. Mot. Partial Summ. J.

10.)  However, Kathrein has provided no evidence to suggest that one person or group controls both Kathrein and Scala and instead maintains that because both Kathrein and Scala are owned by a common owner, there cannot be an invalidating sale under § 102(b).  The court in *Ferag*, however, emphasized that the pivotal issue is not common ownership but whether the seller controls the buyer such that the invention remains out of the public's hands.  45 F.3d at 1567.  Based on the testimony of Scala's president and its own admission, Kathrein did not assert any control over whether those antennas were sold to the public.

This Court holds that Kathrein has not met its burden of establishing a genuine issue of material fact for trial.  This Court grants in part RYMSA's motion for partial summary judgment and holds that Kathrein sold the above-mentioned antennas to Scala.  However, RYMSA must still establish at trial that the antennas sold embodied the engineering drawings and that the engineering drawings constitute prior art under § 102(b).

### B.  August 19, 2004 Amendments

RYMSA argues that an amendment made to Claim 1 of the '130 Patent during prosecution was improper because it was a substantive change that broadened the claim's scope.  (Defs.' Mem. Supp. Mot. Partial Summ. J. 28.)  However, the cases upon which RYMSA relies involved amendments made during reexamination or reissue, not during prosecution, as in this case.  *See Laitram Corp. v. NEC Corp.*, 163 F.3d 1342 (Fed. Cir. 1998) (addressing amendment made during reexamination); *Bloom Eng'g Co. v. N. Am. Mfg. Co.*, 129 F.3d 1247 (Fed. Cir. 1997) (same);  *Thermalloy, Inc. v. Aavid Eng'g*, 121 F.3d 691 (Fed. Cir 1997) (same); *Kim v.*

*Earthgrains Co.*, No. 01 C 3895, 2010 WL 625220 (N.D. Ill. Feb. 18, 2010) (same); *see also Westvaco Corp. v. Int'l Paper Co.*, 991 F.2d 735 (Fed. Cir. 1993) (addressing amendment made during reissue); *Seattle Box Co. v. Indus. Crating & Packing, Inc.*, 731 F.2d 818 (Fed. Cir. 1984) (same). The distinction is important because an inventor's broadening claims during prosecution is proper if the application as filed adequately supports the amended claims. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 909 n.2 (Fed. Cir. 2004) ("[I]t is not improper for an applicant to broaden his claims during prosecution in order to encompass a competitor's products, as long as the disclosure supports the broadened claims."); *In re Rasmussen*, 650 F.2d 1212, 1215 (C.C.P.A. 1981) (same). Once the patent issues, however, "the scope of [his] freedom to modify the patent, whether through reexamination or reissue, is limited." *In re Reiffin Family Trust*, 340 Fed. Appx. 651, 659 (Fed. Cir. 2009).

In contrast, "the fact that the Patent Office allows . . . an amendment without objection thereto as new matter . . . is entitled to an especially weighty presumption of correctness. " *Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1574-75 (Fed. Cir. 1992). Whether an amendment is supported by the disclosure is a question of fact. *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1562 (Fed. Cir. 1991).

When the Inventors first filed the '130 application, claim 1 read, in relevant part: "wherein, the respective connection line is formed with respect to a next, further outward stripline section by extending the respective preceding further inward connection line which leads to the respective further inward tapping section." (Defs.' LR 56.1(a)(3) ¶ 42.) On August 19, 2004, the amended Claim 1 stated: "wherein the *second* connection line is *disposed* with

respect to *the second* stripline section by extending the *first* connection line which leads to the *first* tapping section." (*Id.* (emphasis added).)

RYMSA argues that the disclosure did not support amended Claim 1 because directionality was lost via the amendment. (Defs.' Mem. Supp. Mot. Partial Summ. J. 28.) RYMSA provides an example, which is much like FIG. 5 of the '130 Patent but with curved stripline sections instead of straight ones, to illustrate a device that RYMSA argues would not have been covered under the original version of Claim 1 but would be covered by the amended version of Claim 1. (*Id.* 31.) Kathrein counters that it amended Claim 1 for clarification and formatting purposes and that directionality was maintained even after the amendment. (Pl.'s Opp'n Defs.' Mot. Partial Summ. J. 11, 14.)

The Court agrees with Kathrein and holds that the disclosure in the '130 patent application as filed adequately supports Claim 1 as amended. The example presented by RYMSA would have been covered by Claim 1 prior to the amendment as well as after it. Prior to the amendment, "further inward" would have referred to what RYMSA labels the "first" stripline, and "further outward" would have referred to what RYMSA labels the "second" stripline. RYMSA's contention that directionality is lost is not supported by a plain reading of the claim.

Moreover, the specification of the '130 Patent discloses making more than one tapping section, and that one tapping section is necessarily further away from the axis than the other. Amended Claim 1 is supported by the specification because it teaches just that – a device in which one tapping point is a further away from the axis than the other:

> The tapping element 25 includes a first connection line 31a. Connection line 31a extends from the coupling section 33 in the overlapping area of the center tap 29 to the tapping point 27a on the inner stripline segment 21a. The region which projects as an extension beyond this tapping point 27a forms the next connection section or connection line 31fc. Connection line 31fc leads to the tapping point 27b which is formed in the region in which it overlaps the outer stripline segment 21b.

'130 Patent col. 4, lines 24-32. The specification teaches creating two tapping points of different distances away from the axis and amended Claim 1 teaches the same – creating two tapping points of different distances away from the axis where the stripline segments are arcs. Whether one is labeled "first" or "second" does not change the fact that tapping points that are two different distances away from the axis on the same tapping element, one will necessarily be "further inward" and the other "further outward." Because a reasonable jury could find based on the specification of the '130 Patent and amended Claim 1 that the disclosure supports the amended language, the Court denies RYMSA's motion for partial summary judgment on the issue of whether the August 19, 2004 amendments were substantive.

## II.      Kathrein's Partial Summary Judgment Motion on Inequitable Conduct

Kathrein moves for partial summary judgment on RYMSA's affirmative defense that the '130 patent is unenforceable due to Kathrein's inequitable conduct of failing to disclose relevant prior art. *See Therasense v. Becton, Dickinson & Co.*, Nos. 2008–1511, 2008–1512, 2008–1513, 2008–1514, 2008–1595, 2011 WL 2028255, at *4 (Fed. Cir. May 25, 2011) (stating that inequitable conduct, if proved, bars enforcement of a patent). To prevail on this claim, "the accused infringer must prove by clear and convincing evidence that the applicant knew of the [prior art] reference, knew that it was material, and made a deliberate decision to withhold it."

*Id.* Merely proving that the applicant should have known of the reference's materiality is insufficient. *Id.* at *10. Though a district court may infer intent from indirect and circumstantial evidence, in order to meet the clear and convincing evidence standard, the specific intent to deceive must be "the single most reasonable inference able to be drawn from the evidence." *Id.* (citing *Star Scientific Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008)); *see Scanner Techs. Corp. v. ICOS Vision Sys. Corp.*, 528 F.3d 1365, 1376-78 (Fed. Cir. 2008) (stating that if the summary judgment record "is susceptible of multiple reasonable inferences, a district court clearly errs in overlooking one inference in favor of another equally reasonable inference.").

RYMSA must also prove that the omitted reference was material:

> [T]he materiality required to establish inequitable conduct is but-for materiality. When an applicant fails to disclose prior art to the PTO, that prior art is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art. In making this patentability determination, the court should apply the preponderance of the evidence standard and give claims their broadest possible meaning.

*Therasense*, 2011 WL 2028255, at *11. The *Therasense* court created an exception to requiring a finding of materiality "in cases of affirmative egregious misconduct," but noted that because "neither mere non-disclosure of prior art references to the PTO nor failure to mention prior art references in an affidavit constitutes affirmative egregious misconduct, claims of inequitable conduct that are based on such omissions require but-for materiality." *Id.* at *12.

Ultimately, in order to prevail on its claim of inequitable conduct, RYMSA must prove both materiality and intent by clear and convincing evidence. *Id.* at *10. However, in order to

survive Kathrein's partial summary judgment motion on this affirmative defense, non-movant RYMSA need not establish its claim by clear and convincing evidence and instead must merely provide evidence that could succeed in proving both materiality and intent. *See Therasense*, 2011 WL 2028255, at *9, *11; *see also Optium Corp. v. Emcore Corp.*, 603 F.3d 1313, 1319-20 (Fed. Cir. 2010).

Kathrein's motion for summary judgment is based on RYMSA's claim that Kathrein introduced new matter into the patent and withheld engineering drawings that RYMSA argues is prior art. The Court addresses each in turn.

### A.  Inequitable Conduct Based on Kathrein's Alleged Introduction of New Matter

RYMSA claims that Kathrein engaged in inequitable conduct during the prosecution of the '130 Patent by improperly adding new matter by:  (1) submitting an incorrect English translation of the international application; (2) representing to the USPTO that no new matter had been added to the substitute specification filed on March 30, 2004; and (3) representing that the substitute specification had been provided as required by Examiner Lee and omitting the proper substitute specification.  (Defs.' Opp'n Pl.'s Mem. Supp. Mot. Summ. J. 13.)

An issue of the possible addition of new matter in violation of § 132 is possibly but-for material, as it may lead to a rejection of claims as not being supported by the specification.  *See In re Rasmussen*, 650 F.2d at 1215.  *see* 35 U.S.C. § 132(a) ("No amendment shall introduce new matter into the disclosure of an invention."), *TurboCare Div. of Demag Delaval Turbomachinery Corp. v. Gen. Elec. Co.*, 264 F.3d 1111, 1118 (Fed. Cir. 2001) ("When the applicant adds a claim

or otherwise amends his specification after the original filing date . . . the new claims or other added material must find support in the original specification.")

First, Kathrein argues that there is no proof that it failed to submit to the USPTO a proper English translation of the international application because it received a stamped postcard acknowledging receipt of an "English translation of the international application as filed." (Pl.'s Resp. Defs.' LR 56.1(b)(3)(C) Stmt. ¶ 1.) RYMSA argues that this English translation was not of the original German patent application, but of some later amended version. (Defs.' LR 56.1(b)(3)(B) Stmt. ¶ 3.) RYMSA's expert Nicholas P. Godici testified that the USPTO-certified copy of the file history does not include an English language translation of the original international application. (Defs.' Opp'n Pl.'s Mem. Supp. Mot. Summ. J., Ex. 1, Expert Report of Godici ¶ 62.) Godici further states that if Kathrein did not file a translation of the original German patent application, Examiner Lee could not conclude for himself whether new matter was added to the specification. (*Id.* ¶ 92.) Because the summary judgment record is susceptible of multiple reasonable inferences, including the inference that Kathrein intended to deceive the USPTO by not including an English language translation of the original international application, it would be improper for the Court to hold that Kathrein's omitting the translation was not material.

Second, Kathrein also argues that evidence is lacking for RYMSA's claim that it Kathrein misrepresented its substitute specification as having no new matter. Kathrein contends that because it gave Examiner Lee a translation of the international application and he did not make a new matter objection, there was no material misrepresentation. (Pl.'s Resp. Defs.' LR 56.1(b)(3)(C) Stmt. ¶¶ 2, 4.) Alternatively, Kathrein states that because it gave Examiner Lee

the IPER from EPO Examiner Kaleve, which raised a new matter issue, Examiner Lee could have made, but did not make, a new matter determination, and thus, there was no material misrepresentation. (*Id.*)

Even if Examiner Lee knew that EPO Examiner Kaleve had raised the issue of new matter, the evidence supports the reasonable inference that Kathrein's failure to give him the translation of the original application made it impossible for Examiner Lee to make his own new matter determination with respect to the substitute specification filed on March 30, 2004. (*See* Defs.' Opp'n Pl.'s Mem. Supp. Mot. Summ. J., Ex. 1, Godici Report ¶ 96.) Because the possible addition of new matter may lead to a rejection of claims as not being supported by the specification, the Court holds that RYMSA has created a triable issue regarding whether Kathrein's omission of the translated original application was material.

Third, RYMSA has also raised a triable issue as to whether Kathrein's giving Examiner Lee the wrong substitute specification is material. RYMSA alleges that the substitute specification Kathrein provided was not the one Examiner Lee requested because it did not show the amendments that had been made to the original international application. Because RYMSA's expert has testified that had Examiner Lee had the original application provided to him, Examiner Lee would have made a rejection based on 35 U.S.C. § 132, (*id.*), it has met its burden for withstanding the partial summary judgment motion as to materiality on this issue.

Finally, RYMSA has raised a triable issue regarding whether Kathrein acted with the requisite intent, *i.e.*, made a deliberate decision to submit an incorrect English translation of the international application, misrepresent that no new matter had been added to the substitute

specification filed on March 30, 2004 and misrepresented that the requested substitute specification had been provided when it had been omitted. The record contains circumstantial evidence from which intent to deceive may be reasonably be inferred, including Kathrein's (1) alleged inaccurate representations to the USPTO during prosecution, (2) patent practitioners' failure to make the necessary inquiry into the underlying facts and circumstances, (3) omission of figures in the European Patent application in order to promote the likelihood of obtaining the European patent, and (4) refusal to allow Mr. Dieter Flach to be deposed. (Defs.' LR 56.1(b)(3)(C) Stmt. ¶¶ 5-7.) Because the evidence in the summary judgment record permits multiple reasonable inferences for Kathrein's omissions and representations, RYMSA has successfully raised an issue of material fact for trial regarding Kathrein's intent, which is sufficient for RYMSA to survive summary judgment.

In sum, RYMSA has made a showing that there is a genuine issue as to materiality and intent. With respect to the issue of the possible addition of new matter to the specification, the Court denies Kathrein's motion for partial summary judgment on inequitable conduct is denied.

### B. Inequitable Conduct Based on Kathrein's Alleged Withholding of Engineering Drawings as Prior Art

RYMSA asserts that Kathrein engaged in inequitable conduct by not disclosing Kathrein's engineering drawings as prior art. (Defs.' Opp'n Pl.'s Mem. Supp. Mot. Summ. J. 21.) Through its expert, David Pozar, RYMSA has made a showing that the engineering drawings when combined with other prior art may have caused the USPTO to reject the claims

of the '130 Patent as obvious. (Defs.' Opp'n Pl.'s Mem. Supp. Mot. Summ. J., Ex. 3, Pozar

Report 70-79.) Pozar has testified that Claims 1, 3, 10, 11, 12, 13, 14, 15, 16, and 25 are made

obvious by Japanese Laid-Open Patent Application No. H9-246846 to Kosaka, published on

September 19, 1997 and the Kathrein engineering drawings. (*Id.*) In response, Kathrein cites

the holding by Examiner James Menefee in the inter partes reexamination that RYMSA's

submission, which included the drawings, was not material to the '130 Patent application. (Pl.'s

LR 56.1(a)(3) Stmt., Ex. B, Right of Appeal Notice, at 9; Pl.'s Mot. Suppl. Claim Const. R.., Ex.

D, Third Party Requester's Redacted Comments Patent Owner's March 19, 2009 Resp. Office

Action, at 5.) However, the court is not bound by the PTO's findings and must make its own

determination of patent validity. *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1322 (Fed.

Cir. 2005) (citing *Magnivision, Inc. v. Bonneau Co.*, 115 F.3d 956, 960 (Fed. Cir. 1997)). The

Court finds that Pozar's testimony raises an issue of fact as to the materiality of the drawings.

With respect to intent, RYMSA has established that there is an issue of material fact with

respect to intent. RYMSA offers evidence that: (1) Kathrein knew of their own commercial

antenna products and engineering drawings (Defs.' LR 56.1(b)(3)(B) Stmt. ¶ 14); (2) Kathrein

failed to note that FIG. 1 was based on its own antennas, which gave the appearance that FIG. 1

was a third party's invention thereby preventing Examiner Lee from inquiring further about

other Kathrein engineering drawings (Defs.' Opp'n Pl.'s Mot. Summ. J. 26); (3) Kathrein

amended the text regarding FIG. 1 to eliminate language that said it was an abstract

representation (Defs.' LR 56.1(b)(3)(B) Stmt. ¶ 15); and (4) Kathrein has a demonstrated pattern

of hiding information from the public regarding their phase shifters, as evidenced by the

testimony of Kathrein's Vice President of Marketing Peter Scholz (Defs.' LR 56.1(b)(3)(B)

Stmt. ¶ 16; Defs.' Opp'n Pl.'s Mem. Supp. Mot. Summ. J., Ex. 8, Scholz Dep. at 101:12-102:15

(explaining that a single-arc phase shifter was shown in a brochure instead of a double-arc phase

shifter because he did not want to show customers the technology of the double-arc phase

shifters, despite the fact that double-arc phase shifters are used).)  A reasonable fact finder could

infer from these facts that Kathrein intended to deceive the USPTO by withholding its

engineering drawings.

Viewing the summary judgment record in the light most favorable to the non-movant,

RYMSA has raised triable issues of fact as to materiality and intent with regard to whether

Kathrein's withholding the engineering drawings constitutes inequitable conduct.  The Court

thus denies Kathrein's motion for partial summary judgment as to this issue.

## Conclusion

For the reasons stated above, the Court denies Kathrein's motion for partial summary judgment regarding RYMSA's affirmative defense that the '130 patent is unenforceable due to inequitable conduct [doc. no. 109]. The Court: (1) strikes as moot in part RYMSA's motion for partial summary judgment as to the issues whether (a) Kathrein is not entitled to recover any damages more than a reasonable royalty; and (b) damages may only be calculated beginning from May 24, 2007; (2) grants in part RYMSA's motion for partial summary judgment as to the issue of whether Kathrein sold to Scala Eurocell Panel Antenna Models 738-018, 737-906 and 736-077 before the critical date of August 17, 1998; and (3) and denies in part RYMSA's motion of partial summary judgment in all other respects [doc. no. 101].

**SO ORDERED**                                 **ENTERED:  September 26, 2011**


_____

**HON. RONALD A. GUZMAN**

**United States District Judge**